Timothy C. GUNDERSON, d/b/a Alaska Contract Motor Express, Appellant,

v.

UNIVERSITY OF ALASKA, FAIR-BANKS, and Alaska Railroad Corporation, Appellees.

No. S–6570.

Supreme Court of Alaska.

Sept. 8, 1995.

Lloyd I. Hoppner, Hoppner & Paskvan, P.C., Fairbanks, and Wallace M. Rudolph, Tacoma, WA, for appellant.

James Sarafin, Wohlforth, Argetsinger, Johnson & Brecht, Anchorage, for appellee University of Alaska, Fairbanks.

William R. Hupprich, Alaska Railroad Corporation Office of the General Counsel, Anchorage, and Gary Foster, Law Office of Gary Foster, Fairbanks, for appellee Alaska Railroad Corporation.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MOORE, Chief Justice.

This case arises out of a sole source contract issued by the University of Alaska, Fairbanks campus, (UAF) to Timothy Gunderson, d/b/a Alaska Contract Motor Express (Gunderson). UAF cancelled the contract after Alaska Railroad Corporation (ARRC) filed a formal protest, asserting that the sole source contract violated state law. *See* AS 36.30.300 (providing that a sole source procurement may not be awarded if a reasonable alternative source exists). Gunderson then sued both UAF and ARRC under a variety of theories. On motion by ARRC, the superior court dismissed Gunderson's claims against ARRC, ruling that ARRC was immune from suit under the *Noerr–Pennington* doctrine. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.,* — U.S. —, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993) (under *Noerr–Pennington* doctrine, those who petition the government for redress are generally immune from antitrust and related liability).

In this appeal, Gunderson asserts that the *Noerr–Pennington* doctrine does not bar his claims against ARRC. He also asserts that the court improperly entered final judgment in favor of ARRC under Alaska Civil Rule 54(b). However, because we consider the issues raised in Gunderson's appeal appropri-ate for discretionary review under Alaska Appellate Rule 402(b), we need not consider whether the superior court erred in entering final judgment. *See* Alaska R.App.P. 402(b)(2) (providing that discretionary review is appropriate where an order or decision involves an important question of law on which there is substantial ground for difference of opinion and immediate review may materially advance the ultimate termination of the litigation).

## I. FACTS AND PROCEEDINGS

In 1992 Gunderson submitted an unsolicited proposal to UAF, offering to truck coal to UAF from the Usibelli Coal Mine and to deliver this coal directly into coal hoppers at the UAF power plant in Fairbanks. Up to that time, the coal had been transported by ARRC and delivered in railcars to a siding next to the power plant. This method of delivery required UAF employees to unload coal into the hoppers: a difficult, dangerous and time-consuming job.

UAF officials determined that Gunderson's proposal qualified as a "unique offer" under UAF procurement regulations and awarded Gunderson a five-year sole source contract. The contract set a price of $8.25 per ton and estimated a need for 60,500 tons per year, bringing the total contract price to just under $500,000 per year.

Upon learning of this contract, ARRC filed a formal written protest with UAF. *See* AS 36.30.560 (providing that an interested party may protest a contract award). It asserted that the sole source contract violated both state and university procurement codes and requested that UAF cancel the contract and publicly solicit competitive bids for the job.

UAF's Chief Procurement Officer, Charles Hill, denied ARRC's protest on the ground that ARRC lacked standing to protest UAF's award of the sole source contract because ARRC was not an "interested party" as defined in AS 36.30.699.[1]

---

1. AS 36.30.699 provides:
   In AS 36.30.560—36.30.695, "interested party" means an actual or prospective bidder or offeror whose economic interest may be affect-ed substantially and directly by the issuance of a contract solicitation, the award of a contract, or the failure to award a contract; whether an actual or prospective bidder or offeror has an

ARRC appealed this decision and requested a hearing before an independent hearing officer as authorized by AS 36.30.590. Gerald Neubert, University Architect and Acting Chief Procurement Officer for Protest, subsequently notified ARRC that a hearing would be held for the limited purpose of determining whether ARRC was an "interested party" capable of delivering and unloading coal into the UAF hoppers. The Pre–Hearing Order framed the scope of the hearing as follows:

In order to show that it has standing to maintain an appeal, ARRC has the burden of proving, by a preponderance of the evidence, that at the time the University of Alaska awarded Contract 93–0012 to [Gunderson], ARRC was able to economically provide *all* services required under the ... contract and was willing to do so.

The parties who will participate in this limited hearing are ARRC and the University of Alaska. [Gunderson] is *not* a party.

Hearing Officer Neubert issued written findings of fact and conclusions of law shortly after the hearing. He found, in part:

11. In 1992, ARRC had equipment and manpower available at its Fairbanks rail yard to move coal cars from the UAF rail siding to the UAF power plant hoppers and to unload those coal cars. It also had the ability to subcontract these services.

12. In 1992, ARRC would have been willing to bid on a UAF proposal to provide coal transportation and unloading services to the UAF power plant using its own personnel and equipment. ARRC would have been capable of performing such services.

13. In 1992, ARRC routinely submitted bids or proposals to customers who solicited bids or proposals for transportation and related services. ARRC routinely entered into volume or "requirements" transportation contracts with customers at rates below those contained in ARRC's published tariffs.

14. If UAF had advertised for bids or proposals for coal transportation/unloading services, ARRC would have submitted a bid or proposal to provide such services.

15. UAF's award of a sole source contract to [Gunderson] has substantially affected ARRC's economic interests by depriving ARRC of an opportunity to earn in excess of $2.5 million over the term of the contract. ARRC has an economic interest in the UAF coal delivery contract.

Based on these findings, the hearing officer concluded that ARRC was an "interested party" under AS 36.30.699 because it had the capability to transport and unload coal into the hoppers of the UAF power plant without the assistance of UAF personnel or equipment. He then ruled:

AS 36.30.300 allows a sole source procurement if there is only one source for the required procurement. If there is a reasonable alternative source, a sole source procurement may not be awarded. Because ARRC was a reasonable alternative source for the delivery and unloading of coal, it was improper, as a matter of law, for UAF to award a sole source contract to [Gunderson]. The ARRC protest was legally sufficient and should have been upheld.

UAF subsequently issued a request for proposals for coal transportation and unloading services. Nine companies, including ARRC and Gunderson, submitted bids. UAF awarded the contract to Royal Contractors, the lowest bidder.[2] Gunderson filed a formal protest with UAF, requesting that UAF cancel the contract with Royal Contractors and reinstate his contract. UAF denied this protest.

In August 1993 Gunderson sued both UAF and ARRC under a variety of theories.[3] In the fourth count of his complaint, Gunderson asserted the following claims against ARRC:

economic interest depends on the circumstances.

2. Royal Contractors bid $7.57 per ton. Gunderson submitted the third lowest bid, at $8.18 per ton. ARRC bid $10.20 per ton, the fifth lowest bid.

3. Gunderson raised the following causes of action against UAF: (1) breach of contract; (2) breach of duty of confidentiality and expropriation of intellectual property; and (3) due process violations.

[ARRC] has a monopoly of coal shipments into Fairbanks and generally into interior Alaska. [ARRC], in an attempt to maintain its monopoly, filed a frivolous protest against the issuance of the UAF contract to Gunderson. In the hearing that was subsequently held pursuant to the protest (a hearing in which UAF barred Gunderson from participating), [ARRC] misrepresented the facts and misrepresented its intention to bid a competitive price with Gunderson. The misrepresentation by [ARRC] was for the purpose of injuring Gunderson, and excluding the trucking industry from competing with [ARRC] for the hauling of coal in [the] interior of Alaska. These acts by [ARRC] constitute a common law tort of interference with Gunderson's contractual relationship with UAF; constitute a common law tort of interference with Gunderson's prospective advantage with UAF and other coal consumers in interior Alaska; and constitute a violation of Article A.S. §§ 45.50.471, 501, 531 and A.S. §§ 45.50.562, 45.50.576; or, in the alternative, a violation of 42 U.S.C. 1983. As a result of these common law torts and statutory violations, Gunderson has been damaged in a sum or sums to be proved at trial and is entitled to have these damages tripled pursuant to the appropriate statutory remedies.

ARRC moved to dismiss these claims under Civil Rule 12(b)(6), arguing, *inter alia*, that the *Noerr–Pennington* doctrine barred Gunderson's claims against ARRC. The superior court granted ARRC's motion, ruling that ARRC was immune from suit under the *Noerr–Pennington* doctrine. Because the court considered materials outside the pleadings in dismissing Gunderson's claims, it treated ARRC's motion as a motion for summary judgment. On motion by ARRC, the court then entered final judgment in favor of ARRC under Alaska Civil Rule 54(b). This appeal followed.

## II. STANDARD OF REVIEW

We review de novo the superior court's grant of summary judgment. *Kollodge v. State*, 757 P.2d 1024, 1026 n. 4 (Alaska 1988). "[S]ummary judgment is affirmed if the evidence in the record fails to disclose a genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Dayhoff v. Temsco Helicopters, Inc.*, 772 P.2d 1085, 1086 (Alaska 1989). In reviewing the record, we draw all reasonable inferences in favor of the non-moving party. *Id.*

## III. DISCUSSION

The *Noerr–Pennington* doctrine evolved out of two United States Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In these decisions, the Court held that attempts to influence legislative and executive officials were beyond the scope of the Sherman Act, reasoning that Congress did not intend federal antitrust law to regulate political activities or to infringe on the First Amendment rights of petition and association. *Noerr*, 365 U.S. at 136–38, 81 S.Ct. at 528–29; *Pennington*, 381 U.S. at 669–70, 85 S.Ct. at 1592–93; *see generally* John P. Ludington, Annotation, *Application of Doctrine Exempting From Federal Antitrust Laws Joint Efforts to Influence Legislative or Executive Action*, 17 A.L.R.Fed. 645 (1973).

In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court extended the *Noerr–Pennington* doctrine to include attempts to influence adjudicatory proceedings before administrative agencies and the courts. *Id.* at 510, 92 S.Ct. at 611.

[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors.

*Id.* at 510–11, 92 S.Ct. at 611.

In his brief, Gunderson concedes that the *Noerr–Pennington* doctrine protects the right of a party to invoke the legal process "without fear that such action would be con-

sidered a tortious interference with prospective advantage or a violation of the State's antitrust laws." [4] However, Gunderson goes on to argue that ARRC subverted the legal process by presenting false and misleading evidence at the April 1992 hearing. For this reason, Gunderson argues that ARRC engaged in a "sham" protest designed to destroy Gunderson's contractual relationship with UAF.[5]

The United States Supreme Court has observed that a party will be subject to federal antitrust liability if its efforts to influence governmental action are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533; *see also California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 511–13, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972).

In *California Motor,* a group of California truckers instituted a series of state and federal proceedings in an effort to defeat an application for in-state operating rights filed by a group of out-of-state truckers. The out-of-state truckers subsequently filed a civil action, alleging that the California truckers had violated federal antitrust laws. In holding that the district court had erred in dismissing their complaint under the *Noerr–Pennington* doctrine, the Supreme Court observed:

> Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.,* effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

*Id.* 404 U.S. at 513, 92 S.Ct. at 612.

■ In the wake of *California Motor,* many courts have held that the filing of a single lawsuit may, in certain circumstances, constitute an abuse of the judicial process for the purposes of the *Noerr–Pennington* doctrine. *See, e.g., Aydin Corp. v. Loral Corp.* 718 F.2d 897, 903 (9th Cir.1983) (holding that a single action is sufficient to invoke the sham exception); *Energy Conservation, Inc. v. Heliodyne, Inc.,* 698 F.2d 386, 389 (9th Cir.1983) (holding that a single baseless suit may be held to constitute a sham so long as some abuse of process is alleged); *First Nat'l Bank v. Marquette Nat'l Bank,* 482 F.Supp. 514, 520–21 (D.Minn.1979), *aff'd,* 636 F.2d 195 (8th Cir.1980), *cert. denied,* 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981) (holding that the filing of a single action may constitute a "sham" under the *Noerr–Pennington* doctrine if the action involved uneth-

---

**4.** Thus Gunderson concedes that the *Noerr–Pennington* doctrine applies to his state antitrust law claims under AS 45.50.562–.596 (Alaska Restraint of Trade Act). He also concedes that the *Noerr–Pennington* doctrine may bar a party from bringing related business tort and § 1983 claims. *See Video Int'l Prod. v. Warner-Amex Cable Communications, Inc.,* 858 F.2d 1075, 1084 (5th Cir. 1988), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989) (holding that conduct protected from antitrust liability under the *Noerr–Pennington* doctrine is also shielded from business tort and § 1983 claims).

**5.** On appeal, Gunderson also contends that ARRC's protest falls within the "sham" exception because he was improperly excluded from the

April 1992 hearing in violation of his due process rights. However, Gunderson did not present this argument to the trial court or include this issue in his points on appeal. Therefore it is waived. *See Moran v. Holman,* 501 P.2d 769, 769–70 (Alaska 1972) (this court will not consider on appeal arguments which were not raised before the trial court or which were not included in statement of points on appeal).

In any case, Gunderson makes no attempt to argue that ARRC affirmatively sought to exclude Gunderson from the hearing or that ARRC was involved in any way in the hearing officer's decision. As ARRC points out, in the absence of any such connection, Gunderson's exclusion from the hearing process has no bearing on its right to *Noerr–Pennington* immunity.

ical conduct). *See generally* Glenn A. Guarino, Annotation, *"Sham" Exception to Application of Noerr–Pennington Doctrine, Exempting from Federal Antitrust Laws Joint Efforts to Influence Governmental Action,* 71 A.L.R.Fed. 723 (1985).

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,* —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993), the Supreme Court established a two-part test for determining whether a particular lawsuit constitutes a "sham."

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationships of a competitor," *Noerr, supra,* 365 U.S., at 144, 81 S.Ct., at 533 (emphasis added), through the "use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon," *[City of Columbia, Columbia Outdoor Advertising, Inc. v.] Omni [Outdoor Advertising],* 499 U.S., [365] at 375, 111 S.Ct., at 1354 [113 L.Ed.2d 382] (emphasis in original). This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability. Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.

*Id.* —— U.S. at ——, 113 S.Ct. at 1928 (footnote omitted). However, the Court in *Co-lumbia Pictures* expressly declined to decide whether the *Noerr–Pennington* doctrine immunizes parties who commit fraud and misrepresentation in bringing an action.

> In surveying the "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations," we have noted that "unethical conduct in the setting of the adjudicatory process often results in sanctions" and that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport,* 404 U.S., at 512–513, 92 S.Ct., at 613. We need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations. *Cf.* Fed.Rule Civ.Proc. 60(b)(3) (allowing a federal court to "relieve a party . . . from a final judgment" for "fraud . . . , misrepresentation, or other misconduct of an adverse party"); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 176–177, 86 S.Ct. 347, 349–350, 15 L.Ed.2d 247 (1965); *id.* at 179–180, 86 S.Ct., at 351–52 (Harlan, J., concurring).

*Id.* —— U.S. at ——, 113 S.Ct. at 1929 n. 6.

On appeal, Gunderson does not argue that ARRC's protest was "objectively baseless." Rather, he asserts, as he did below, that ARRC misrepresented its ability and intention to bid a competitive price at the April 1992 hearing. Citing footnote six of *Columbia Pictures,* Gunderson argues that ARRC's alleged misrepresentations at the hearing suffice to make its protest a "sham" without regard to the objective merit of its protest or ARRC's motivation. In other words, Gunderson contends that where a party engages in misrepresentation or fraud during the judicial process, the two-part *Columbia Pictures* test does not apply.

As the superior court observed, the Ninth Circuit recently considered and rejected this very argument. *See Liberty Lake Invs., Inc. v. Magnuson,* 12 F.3d 155 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 77, 130 L.Ed.2d 32 (1994). In *Liberty Lake,* a property developer sued a number of business

competitors, alleging that they had conspired to mount a frivolous environmental challenge to the developer's plans to market a tract of land as a regional shopping center. *Id.* at 156. The district court granted summary judgment in favor of the defendants, ruling, *inter alia,* that the defendants were immune from suit under the *Noerr–Pennington* doctrine. *Id.*

On appeal, the Ninth Circuit affirmed, holding that the environmental challenge was not "objectively baseless" under *Columbia Pictures* and that the defendants were entitled to *Noerr–Pennington* immunity. *Id.* at 157–58. The court rejected the developer's contention that the defendants' alleged fraud and misrepresentations in the course of the litigation sufficed "to make the litigation a sham without regard to the objective merit of the lawsuit or its proponents' motivation." *Id.* at 158.

As we read the Court's footnote 6, however, it does no more than reserve the issue of whether antitrust liability may be premised on a litigant's deceptive conduct which goes to the core of a lawsuit's legitimacy, such that it is not "genuine," either in the sense of " 'having the reputed or apparent qualities or character' " (i.e., objectively "genuine") or being " 'sincerely and honestly felt or experienced' " (i.e., subjectively "genuine"). *Id.* [—— U.S.] at ——, 113 S.Ct. at 1929 (quoting Webster's Third New International Dictionary 948 (1986)).

Following its reservation of the question whether "fraud or other misrepresentations" may amount to "sham," the Court cited as analogous authority *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), which held that a patent procured by intentional fraud on the Patent Office could form the basis for a federal antitrust claim, *id.* at 176–77, 86 S.Ct. at 349–50; Justice Harlan's *Walker Process* concurrence which emphasized that the Court's holding reached only "deliberate fraud," *id.* at 179–80, 86 S.Ct. at 351–52 (Harlan, J., concurring); and Rule

60(b)(3), which allows a party to obtain relief from judgment because of its opponent's "fraud ... misrepresentation, or other misconduct."

In a case involving a fraudulently-obtained patent, that which immunizes the predatory behavior from antitrust liability (the patent) is, in effect, a nullity because of the underlying fraud. Similarly, Rule 60(b)(3) enables a party to set aside an otherwise valid judgment on the ground that it resulted from an opposing party's fraudulent behavior or misrepresentation to the court. *See* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2860, at 188–89 (1973). Read in context with the entire [*Columbia Pictures* ] opinion, footnote 6 does not obviate application of the Court's two-part test for determining sham litigation in the absence of proof that a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

*Id.* at 158–59 (footnote omitted).

■ We find the Ninth Circuit's reading of *Columbia Pictures* persuasive. Allegations of fraud and misrepresentation in the judicial process will only block *Noerr–Pennington* immunity when such allegations go "to the core of a lawsuit's legitimacy." *Id.* at 158. In this case, Gunderson's complaint charged ARRC with misrepresenting "the facts and ... its intention to bid a competitive price with Gunderson" in its protest. Even assuming the truth of this charge, these misrepresentations do not go to the heart of ARRC's protest. ARRC challenged the sole source contract award to Gunderson on the ground that it was capable of providing the delivery and unloading services offered by Gunderson. *See* AS 36.30.300 (providing that a sole source procurement is permitted only when there is one source for the required good or service). Gunderson has never argued that ARRC is not capable of providing these services. As noted by ARRC, the fact that ARRC prevailed in its protest and that nine companies ultimately submitted bids demonstrates the protest's legitimacy.[6] *See Colum-*

---

**6.** In a related argument, Gunderson contends that the superior court improperly "assumed" that the sole source contract was illegal under AS 36.30.300. Essentially, Gunderson is arguing

*bia Pictures,* —— U.S. at ——, 113 S.Ct. at 1928 (noting that a successful lawsuit is "by definition a reasonable effort at petitioning for redress and therefore not a sham").

We therefore conclude that the superior court properly granted summary judgment in favor of ARRC.[7]

AFFIRMED.

that UAF should be able to award a sole source contract to a business which comes up with an innovative service, even if other businesses are equally capable of providing the proposed service. However, this argument has no bearing on whether ARRC is entitled to *Noerr–Pennington* immunity. Even if the superior court were to ultimately conclude that UAF could properly award Gunderson a sole source contract in these circumstances, ARRC would still be entitled to immunity as long as there

was a legitimate basis for its protest. *See Columbia Pictures,* —— U.S. at —— n. 5, 113 S.Ct. at 1928 n. 5 (noting that a losing lawsuit does not prove that the litigation was a sham).

7. Because we conclude that the *Noerr–Pennington* doctrine bars Gunderson's claims, we need not address the other grounds raised by ARRC for affirming the superior court's dismissal.