Present:  All the Justices

LOCKHEED INFORMATION MANAGEMENT
SYSTEMS COMPANY, INC., ET AL.

v.   Record No. 990500

MAXIMUS, INC.

OPINION BY JUSTICE ELIZABETH B. LACY
January 14, 2000

MAXIMUS, INC.

v.   Record No. 990499

LOCKHEED INFORMATION MANAGEMENT
SYSTEMS COMPANY, INC., ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Randall G. Johnson, Judge

     This is the second appeal arising from the cancellation of a Notice of Intent to Award a contract to privatize two child support offices of the Virginia Department of Social Services (DSS).  In 1995, Maximus, Inc. and Lockheed Information Management Systems Co., Inc. (Lockheed) submitted bids pursuant to a request for proposals issued by DSS.  DSS issued a Notice of Intent to Award the contract to Maximus.  Pursuant to Code § 11-66, Lockheed filed a protest to DSS's decision.  Among the statements in the protest were allegations that two members of the evaluation panel had undisclosed conflicts of interest.  The Notice of Intent to Award the contract was subsequently cancelled.

Maximus filed this action alleging that Lockheed had tortiously interfered with its contract expectancy and that Lockheed, The Center for The Support of Families, Inc., (the Center) and an employee of the Center engaged in a conspiracy to injure Maximus' reputation and business in violation of §§ 18.2-499 and -500.[1]

The trial court granted Lockheed's motion to strike at the close of Maximus' evidence at the first trial and entered judgment in favor of the defendants because it found that there was no showing of malice or other egregious conduct. We awarded Maximus an appeal and reversed, holding that such evidence was not required as an element of a claim for tortious interference with contract expectancy. The case was remanded for further proceedings. Maximus, Inc. v. Lockheed Inf. Mgmt. Systems, 254 Va. 408, 493 S.E.2d 375 (1997).

At the second trial, the jury returned a verdict in favor of Maximus for $1,500,000 on the tortious interference with contract expectancy claim, Count I, and for $3,000,000 on the conspiracy claim, Count II. Following post-trial motions and briefing, the trial court denied Lockheed's motions to strike the evidence and to set aside the verdict, but reduced the amount of the verdict. The trial court determined that the

---

[1] The claim against the employee was eventually non-suited.

damages claimed under both Count I and Count II were identical, and, accordingly, limited Maximus to a single damage recovery. The trial court further concluded that Maximus was not entitled to recover the costs it incurred in preparing the bid or the amounts assigned as lost overhead. The trial court then granted Maximus' motion for treble damages pursuant to § 18.2-500 and entered judgment in the amount of $2,223,372 in damages plus attorneys' fees and costs.

Lockheed filed an appeal challenging a number of rulings by the trial court. Maximus filed an appeal limited to the trial court's determination that Maximus could not recover lost overhead as part of lost profits. We granted both petitions for appeal and have consolidated the appeals.

FACTS

In November 1994, DSS issued a request for proposals pursuant to the Virginia Public Procurement Act, Code §§ 11-35 through -80. DSS sought to privatize two child support enforcement offices in Northern Virginia. Lockheed and Maximus submitted timely responses. The proposals were evaluated by a five member committee, including Carolyn W. Davis and Ernest Lee Williams, employees of DSS. The committee was chaired by Jane Hollowell, contracts officer for

DSS.  A Notice of Intent to Award the contract to Maximus was issued on April 13, 1995.

Shortly thereafter, the two contracting officers for DSS, Jane Hollowell and Clifford Crofford, learned that Lockheed might file a protest, based on a number of issues, including a possible conflict of interest by two of the members of the evaluation committee.  Joseph Crane, Assistant Director for Program Development and Administration of the Division of Child Support Enforcement, sent a memorandum to Michael Henry, Director of the Division, reciting the anticipated allegations and raising the possibility that the Notice of Intent to Award might have to be rescinded.  Crane suggested, however, that assuming nothing new came out in the protest, the Notice of Intent to Award could stand as issued if the score of one of the persons alleged to have a conflict of interest were removed.  Henry agreed with this recommendation.

Henry also received a telephone call from Harry W. Wiggins, the Lockheed Vice President in charge of the bid proposal and a former head of DSS, telling Henry that if DSS proceeded with awarding the contract to Maximus, things would get "ugly" or "bloody."

Lockheed filed its protest on April 25, 1995, accompanied by the affidavits of Wiggins, Robyn Large, a Center employee and a former DSS and Lockheed employee, and Christy Leavell, a

4

Lockheed employee.  In the protest, Lockheed asserted that within seven months preceding the posting of the Notice of Intent to Award, Ernest Lee Williams was an "active candidate for employment" with Lockheed but was not hired.  Lockheed also stated that Carolyn Davis had been employed by Maximus while on leave from DSS and that she had been offered employment with Maximus in Tennessee.  The protest also stated that Maximus asked Davis to submit a resume as a prospective employee on the bid at issue.  Davis complied, and, according to Lockheed, indicated she would be willing to talk to Maximus if Maximus received the contract for the Virginia work.  The protest also alleged that Davis called Wiggins seeking employment with Lockheed at some point after the request for proposals had been issued.

Based on these allegations, Lockheed argued in its protest that Williams concealed a material fact regarding his connection with Lockheed, and that his failure to get the position could have materially interfered with his objectivity as a member of the evaluation committee.  Lockheed stated that Davis' situation was "more egregious" than that of Williams, constituted two violations of the Public Procurement Act, and affected her ability to render a fair and impartial decision.  Lockheed stated that it was "reluctant to suggest that the facts and circumstances surrounding Ms. Davis' participation

5

on the Evaluation Committee [rose] to the level of 'corruption.'" Nevertheless, "the seriousness of such an allegation cannot be trivialized" and "the question must be asked" whether she used her position on the evaluation committee "to procure an employment benefit for herself contrary to her duty and the rights of others." Lockheed also suggested that because Davis had a better chance of employment with Maximus than with Lockheed, Davis may have made some comments at the deliberations which "could have influenced other committee members in a manner inimical to Lockheed's interests." Following receipt of the protest, DSS cancelled the Intent to Award and sent out a new request for proposals.

At trial, Williams testified that he had never applied for employment with Lockheed and had not been an active candidate for employment within seven months preceding the request for proposals. Davis testified that in 1992 she had served as a consultant to Lockheed for one month while she was on annual leave from DSS. As shown by a letter, dated March 25, 1992 and introduced into evidence, this arrangement was known to, and approved by, DSS. Davis also testified, among other things, that she sent out some resumes anticipating that she might be required to look for a new job because her husband was about to be transferred.

Finally, Henry testified that he recommended to the DSS Commissioners that the Notice of Intent to Award should be cancelled for reasons of expediency, because Lockheed was going to "tie us up" in proceedings, and "fear of a public spectacle" resulting from the strong allegations in the protest.

We begin by addressing the assignments of error raised by Lockheed in its appeal.

I.

### Lockheed Information Management Systems Company, Inc., et al. v. Maximus, Inc.
Record No. 990500

#### A.  PRIVILEGE

Lockheed asserts that the trial court erred in denying its motion for summary judgment because the statements made in its protest, even if false and misleading, were absolutely privileged.  Lockheed further argues that even if the statements were not absolutely privileged, Lockheed was entitled to an affirmative defense of lawful justification or qualified privilege and the trial court erred in denying Lockheed's jury instruction on that defense.  We first consider Lockheed's contention regarding the existence of an absolute privilege.

1.  Absolute Privilege

a.  Judicial Proceeding

7

Lockheed argues that because the statements at issue were made in the course of a quasi-judicial or administrative hearing, they were entitled to an absolute privilege. We disagree. We have held that false, misleading, or defamatory communications, even if published with malicious intent, are not actionable if they are material to, and made in the course of, a judicial or quasi-judicial proceeding. Penick v. Ratcliffe, 149 Va. 618, 636-37, 140 S.E. 664, 670 (1927). This absolute privilege has been extended to communications made in administrative hearings so long as the "safeguards that surround" judicial proceedings are present. Elder v. Holland, 208 Va. 15, 22, 155 S.E.2d 369, 374 (1967). Those safeguards include such things as the power to issue subpoenas, liability for perjury, and the applicability of the rules of evidence. Id. The bid protest proceeding in which the statements complained of in this case were made, however, did not have the safeguards inherent in a judicial proceeding.

Lockheed's protest was filed pursuant to § 11-66(A) which provides the procedure for an unsuccessful bidder to file a protest to the action of a public body in the procurement process. The public body or its designated agent must render a written decision on the protest within ten days of receiving the protest stating the reasons for the action. That decision is final unless appealed. Neither notice nor hearing is

afforded any other party or bidder, including the successful bidder.  This procedure contains none of the safeguards identified in Elder as prerequisites for the application of the absolute privilege defense.[2]  While these safeguards may attach in an appeal of the decision, the absence of the safeguards from the proceeding in which the statements are made precludes application of the absolute privilege defense to those statements.

### b.  Affidavits

Lockheed also argues that it was entitled to an absolute privilege because the complained of statements were contained in affidavits.  Lockheed asserts that the protection of absolute privilege was extended to affidavits in Donohoe Construction Co. Inc. v. Mount Vernon Associates, 235 Va. 531, 538, 369 S.E.2d 857, 861 (1988), because the Court in that case described the execution of an affidavit as a "judicial act."  Lockheed misconstrues Donohoe.

Donohoe was a mechanic's lien case in which the Court concluded that, because filing the mechanic's lien affidavit to perfect the lien is a prerequisite to filing suit to

---

[2] Subsection C of § 11-66 requires notice and hearing prior to a determination that the bid award was based on fraud, corruption, or a violation of the Act.  However, the provisions of that subsection are not relevant to our inquiry here because there was no proceeding under that subsection in connection with Lockheed's protest.

9

enforce the lien, the filing of the lien and the suit to enforce the lien were inseparable. Id. at 539, 369 S.E.2d 861. Therefore, because the filing of the memorandum of lien affidavit and the suit to enforce the lien constituted a single judicial proceeding, the contents of the affidavit were entitled to an absolute privilege. Id. The doctrine of absolute privilege was not extended to the mere execution of any affidavit.

In this case, even if affidavits were required as an integral part of the protest, which they are not, we have already concluded that the protest procedure under § 11-66(A) does not qualify as a judicial proceeding. Thus, Donohoe does not apply to clothe the statements made in Lockheed's protest with an absolute privilege because they were contained in affidavits.

c. Noerr-Pennington Doctrine

Finally, Lockheed argues that it was entitled to an absolute privilege for its statements under the "Noerr-Pennington" doctrine. This doctrine is based on United Mine Workers v. Pennington, 381 U.S. 657 (1965), and Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961). The doctrine developed because business entities seeking to influence legislative or executive policy which would benefit them and injure competitors were charged

10

with violations of the federal anti-trust laws.  Grounded in the constitutional right to free speech and to petition the government, the Noerr-Pennington doctrine provides that persons petitioning the government cannot be charged with violations of the Sherman Antitrust Act for attempts to influence legislative or executive action.  Pennington, 381 U.S. at 669; Noerr, 365 U.S. at 135.  The doctrine also applies to adjudicatory proceedings before administrative agencies.  California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972).

Lockheed asserts that the Noerr-Pennington Doctrine has been applied to shield conduct from common law business tort claims as well as from antitrust claims.  Citing Gunderson v. University of Alaska, 902 P.2d 323 (Alaska 1995), and Video International Production, Inc. v. Warner-Amex Cable Communications, Inc., 858 F.2d 1075 (5th Cir. 1988), cert. denied 491 U.S. 906 (1989), Lockheed urges us to extend an absolute privilege based on the Noerr-Pennington doctrine to its actions in this case.  While both cases cited by Lockheed applied the Noerr-Pennington doctrine in causes of action for business torts, we do not find those cases applicable here.

Video International involved the actions of competing cable television providers and the City of Dallas.  The plaintiff, an unfranchised cable television provider in

11

Dallas, filed suit against the city and Warner-Amex alleging that the city, at the urging of Warner-Amex, adopted a certain interpretation of the city's cable franchise agreement with Warner-Amex[3] and, also at Warner-Amex's urging, filed notices of zoning violations against the plaintiff based on that interpretation.  This action, according to the plaintiff, violated its civil rights and antitrust laws and, because it adversely impacted the consummation of the sale of plaintiff to a third party, tortiously interfered with a business contract.  On appeal, the Fifth Circuit affirmed the district court's holding that the Noerr-Pennington doctrine applied to both the antitrust claims and the business tort claim.  858 F.2d at 1084.

Warner-Amex's actions seeking a specific interpretation of an ordinance by the city are closely analogous to petitioning the government to influence public policy.  Thus, the application of the Noerr-Pennington doctrine to the business tort claim in Video International was consistent with the traditional application of the doctrine.  Here, however,

---

[3] The zoning ordinances included the franchise agreement between the city and Warner-Amex which provided that no cable television provider could use the city's streets or operate in the city without a franchise.  The city interpreted "using the city streets" as including crossing public right of ways or property lines.  Video International Production, Inc. v. Warner-Amex Cable Communications, Inc., 858 F.2d 1075 (5th Cir. 1988), cert. denied 491 U.S. 906 (1989).

Lockheed did not petition DSS for a particular interpretation of the procurement law or attempt to influence any other governmental policy. Lockheed's actions in this case are not analogous to the "petitioning" of the city by Warner-Amex. Consequently, an extension of the Noerr-Pennington doctrine based on Video International is not warranted in this case.

While the facts of Gunderson parallel the instant case, Gunderson provides no persuasive rationale for applying the Noerr-Pennington doctrine in this case. The Alaska Supreme Court allowed application of the doctrine to a common law business tort claim based on the plaintiff's concession that the doctrine was applicable. No such concession has been made by Maximus in this case.

Maximus does not assert that the Noerr-Pennington doctrine can never be applied in common law business tort cases. Instead, Maximus argues that, regardless of whether a claim is one for a violation of an antitrust statute or a common law business tort, the Noerr-Pennington doctrine should not be applied in actions involving bid protests because such activity is not the type of petitioning of the government which the doctrine was intended to protect. Maximus cites a number of cases in which courts have refused to apply the Noerr-Pennington doctrine, not based on the cause of action

13

asserted, but because the activity complained of was not aimed at influencing governmental policy decisions.

For example, in Whitten v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970), a contractor filed suit claiming that the defendant, its competitor, violated the antitrust laws by certain actions it took in persuading a public body to use specifications for swimming pools which could be met only by the defendant. The First Circuit refused to apply the Noerr-Pennington doctrine to the defendant's actions holding that the doctrine is intended to "insur[e] uninhibited access to government policy makers" and not intended to apply to instances in which public officials are engaged in purely commercial dealings. Id. at 32. The Court went on to conclude that when government officials engage in a competitive bidding process similar to the type engaged in by private corporations, no additional First Amendment protections should be provided. Id. at 33.

Similarly, in F. Buddie Contracting, Inc. v. Seawright, 595 F.Supp. 422 (N.D. Ohio 1984), an unsuccessful bidder sued the successful bidder and others claiming an antitrust violation. The plaintiff alleged that the defendants conspired to secure the award of the contract from the public body even though the successful bidder was not the lowest bidder. The trial court denied the defendants' summary

judgment motion on a number of grounds including its conclusion that the activities of the defendants were not the type of activities protected by the Noerr-Pennington doctrine. Adopting the "commercial activities exception" developed by the United States Courts of Appeals for the First, Fifth, and District of Columbia Circuits, the court stated:

> Noerr-Pennington is concerned with the needs of a representative democracy in the field of public policy making. These needs are not at issue in this case, where the parties are concerned with the award of a competitively bid contract which only incidentally involves a government body. The basis for the exception, therefore, does not apply to this case.

Id. at 439. Thus, under the commercial activities exception, the Noerr-Pennington doctrine does not apply to cases in which the government entity is acting as a market participant.

We find the rationale of these cases persuasive. The Noerr-Pennington doctrine was developed as a protection for entities petitioning the government in relation to legislative or policy making matters. The doctrine was not intended to shield false, misleading, or otherwise improper conduct by bidders for government contracts, particularly when the governmental body is acting as a private commercial entity. The extension of the Noerr-Pennington immunity to Lockheed's actions in this case would represent a significant step beyond the intended boundaries of the doctrine and would contravene

15

the policy behind the establishment of the doctrine.
Accordingly, we decline Lockheed's invitation to extend the
application of the Noerr-Pennington doctrine in this case.

## 2. Qualified Privilege

Lockheed argues that even if it did not have an absolute
privilege, it was entitled to an affirmative defense similar
to a qualified privilege defense on the basis of "legitimate
business competition and protection of the public interest."
Because the trial court refused Lockheed's Jury Instruction I,
Lockheed contends that the jury was erroneously limited to
considering only legitimate business competition as the basis
for its affirmative defense.[4]

We have previously acknowledged that an affirmative
defense of justification or privilege applies in a claim for
intentional interference in a business contract.  Maximus v.
Lockheed, 254 Va. at 412-13, 493 S.E.2d at 378.  We also
identified the five grounds upon which this affirmative
defense is based, none of which includes "protection of the
public interest" as Lockheed asserts.  Id.; Duggin v. Adams,
234 Va. 221, 229, 360 S.E.2d 832, 838 (1987); Chavis v.

---

[4] Jury Instruction I provided:  "For Count I lawful
justification includes conduct by Lockheed and The Center for
reasons of legitimate business competition or protection of
the public interest."

16

<u>Johnson</u>, 230 Va. 112, 121, 335 S.E.2d 97, 103 (1985).  The

jury in this case was instructed that

> Lockheed claims that its interference with
> Maximus' prospective business relationship with DSS
> was justified based upon legitimate business
> competition.  On this issue, Lockheed has the
> burden of proof.
> If you find by the greater weight of the
> evidence that Lockheed's actions constituted
> legitimate business competition with respect to
> Maximus' prospective business relationship with
> DSS, then you shall return your verdict in favor of
> Lockheed on Maximus' tortious interference claim.

This instruction properly presented Lockheed's affirmative

defense to the jury.  Accordingly, the trial court did not err

in denying Jury Instruction I.

## B.  CONSPIRACY

Lockheed contends that Maximus was precluded from

relitigating its conspiracy count in the remanded proceeding

because Maximus did not assign error to the trial court's

order in the first trial as it affected the conspiracy count.

Thus, the trial court's ruling became final as to the

conspiracy count, and, Lockheed argues, the trial court on

remand erred in denying its motion for summary judgment on

this count.

Maximus argues that in the first trial, the trial court

"did not rule at all, much less enter 'judgment' for Lockheed

on Count II."  The judgment in favor of Lockheed in the first

case, according to Maximus, was based on the trial court's

17

conclusion that Maximus failed to prove an element of the tortious interference claim, rather than the conspiracy claim, and Maximus contends that the language of the trial court's judgment order in the first case did not specifically refer to the conspiracy count.  We disagree.

At the close of Maximus' evidence in the first trial, the trial court granted Lockheed's motion to strike the evidence because it did not show that Lockheed had engaged in malicious or egregious conduct, elements which the trial court believed were necessary to sustain a claim of tortious interference with contract expectancy.  Maximus v. Lockheed, 254 Va. at 411, 493 S.E.2d at 376-77.  The order entered by the trial court recited that the "plaintiff shall take nothing and that judgment be entered in favor of the defendants, plus costs." In its appeal to this Court, Maximus assigned error to the trial court's ruling that malice was an essential element of the tortious interference.  Id., 493 S.E.2d at 377.  Maximus did not address conspiracy or Count II in an assignment of error.

If the order entered by the trial court following the first trial did not dispose of the conspiracy count, it would not have been a final, appealable order.  A final appealable order is one which terminates the action leaving nothing to be done by the trial court except that which is necessary to

18

execute the decree. Lee v. Lee, 142 Va. 244, 250, 128 S.E. 524, 526 (1925). An order is not final and appealable if claims against the defendant remain unresolved. Leggett v. Caudill, 247 Va. 130, 133, 439 S.E.2d 350, 351 (1994). Thus, to be a final appealable order, the order of the trial court following the first trial of this matter had to dispose of the entire case, including the conspiracy count.[5]

The order of the trial court quoted above entered judgment in favor of the "defendants" (emphasis added). Lockheed was the sole defendant in Count I, Tortious Interference. Maximus' allegations against the remaining defendants, Robyn Large and the Center, were limited to the conspiracy count, Count II. The language of the order, therefore, in entering judgment for all defendants, did dispose of the conspiracy count and was therefore a final appealable order.[6]

Finally, Maximus relies on Nassif v. Board of Supervisors, 231 Va. 472, 345 S.E.2d 520 (1986), to support

---

[5] We have held that an order disposing of all claims against one defendant may be a final appealable order even if claims against other defendants remain. Dalloul v. Agbey, 255 Va. 511, 515 n.2, 499 S.E.2d 279, 282 n.2 (1998). In this case, if the order entered sustaining Lockheed's motion to strike in the first trial had been limited to the tortious interference claim, it would not have been an appealable order under this rule because it did not fully dispose of all the claims against Lockheed.

19

its contention that it was not required to assign error regarding the conspiracy count and was entitled to assert its conspiracy count on remand. Specifically, Maximus quotes language from the opinion that, unless limited by the order of remand, "the slate is wiped clean, with the result that on remand the parties begin anew." Id. at 480, 345 S.E.2d at 525. However, in Nassif, the party seeking to "begin anew" was the appellee in the first appeal. The first appeal was taken from an order of the trial court sustaining the appellee's contention that a tax assessment was erroneous. This order was based on one of the several arguments raised by the appellee in support of its position but did not address the remaining contentions. In this context, the Court in Nassif stated, "[i]t would serve no useful purpose, we think, to require a prevailing party to assign error to his failure to win on all points in order to protect his right to a full and complete trial should his apparent victory be reversed and the case remanded." Id. at 480-81, 345 S.E.2d at 525.

The Nassif case, at most, stands for the proposition that an appellee does not have to assign cross-error to the failure of the trial court to address additional arguments in order to reassert those arguments on remand. It does not, and cannot,

---

[6] Maximus did not seek clarification of the trial court's order.

20

stand for the proposition asserted by Maximus, that an appellant does not have to assign error to a ruling disposing of a cause of action, and if the case is remanded, can then relitigate a dispositive ruling which was not appealed. Such a proposition contradicts the doctrine of the law of the case which provides that where no assignment of error or cross-error is taken to a part of a final judgment, the judgment becomes the law of the case and is not subject to relitigation. Searles' Adm'r v. Gordon's Adm'r, 156 Va. 289, 294-99, 157 S.E. 759, 761-62 (1931).

Maximus was not the prevailing party in the first appeal and, therefore, under the law of the case, Maximus was not entitled to relitigate unappealed issues on remand.

For these reasons we conclude that the trial court erred in denying Lockheed's motion for summary judgment on its claim that Maximus' failure following the first trial to assign error to the trial court's judgment relative to its conspiracy count barred Maximus from litigating that count on remand.[7]

### C. DAMAGES

Lockheed assigns error to a number of the trial court's rulings regarding Maximus' damage recovery. These assignments

---

[7] In light of this holding, we need not consider Lockheed's assignments of error relating to the level of proof required for the conspiracy count and whether treble damages under § 8.2-500(a) are mandatory or discretionary.

21

of error involve the application of the "new business rule,"
the qualification of Maximus' expert on lost profits, and
Maximus' duty to mitigate damages.  We consider these issues
in order.

1.  New Business Rule

Lockheed argues that Maximus had not previously engaged
in the collection of child support payments in Virginia.
Therefore, the venture proposed by Maximus in its response to
DSS's request for proposals was a new business for Maximus and
Lockheed asserts that Maximus' evidence of lost profits should
have been excluded under the "new business rule."

In Mullen v. Brantley, 213 Va. 765, 768, 195 S.E.2d 696,
699-700 (1973), we stated that evidence of the prior and
subsequent earning record of a business can be used to
estimate damages, in the case of an established business with
an established earning capacity.  But, where a new business is
involved

> the rule is not applicable for the reason that
> such a business is a speculative venture, the
> successful operation of which depends upon future
> bargains, the status of the market, and too many
> other contingencies to furnish a safeguard in
> fixing the measure of damages.  (Citations
> omitted.)

Id. at 768, 195 S.E.2d at 700.  This principle has become
known as the "new business rule."  Commercial Business

22

<u>Systems, Inc. v. BellSouth Services, Inc.</u>, 249 Va. 39, 50, 453 S.E.2d 261, 268 (1995).

The trial court observed that if, as Lockheed suggests, the new business rule were applied as an absolute bar to damage recovery in this case, a cause of action for intentional interference with a contract expectancy would be meaningless, because "anybody anywhere in Virginia could lie, cheat, and steal to deprive any new business, or any existing business that has never operated in Virginia, of a contract expectancy with complete civil impunity." The trial court rejected this construction of Virginia law, and, relying on the principle discussed in <u>Wood v. Pender-Doxey Grocery Company</u>, 151 Va. 706, 144 S.E. 635 (1928), concluded that "the fact that Maximus had never engaged in collecting child support in Virginia cannot be used to deprive it of damages."

In <u>Wood</u>, a plaintiff was allowed to recover damages for breach of contract including lost "good will" even though, as the appellant argued in that case, the evidence of the damages was difficult to calculate with mathematical precision or reasonable certainty. The Court in <u>Wood</u> allowed recovery, reasoning that in cases involving an intentional wrong

> the degree of proof necessary is much relaxed in favor of the injured party. Where the wrongdoer creates the situation that makes proof of the exact amount of damages difficult, he must realize that in such cases

> "juries are allowed to act upon probable and inferential, as well as direct and positive, proof."  Chesapeake & Potomac Tel. Co. v. Carless, 127 Va. 5, 102 S.E. 569, 23 A.L.R. 943 (1920).

151 Va. at 713, 144 S.E. at 638.  Applying this rationale, the trial court concluded that Maximus introduced sufficient evidence upon which "a reasonable estimate of Maximus' lost profits could be made."

Based on this record, we cannot say the trial court erred by refusing to apply the new business rule to strike Maximus' evidence on lost profits.  While most newly undertaken ventures may not have the requisite record of performance and thus come within the "new business rule," that is a decision to be made by the trial court in the first instance.  In allowing the jury to consider Maximus' evidence of lost profits and other damage evidence, the trial court here did not eliminate the new business rule or the requirement that damages must be shown with reasonable specificity.  The trial court only held that, in a claim for intentional interference with a business expectancy, recovery will not be defeated solely because the business expectancy is not one which is identical in every detail to the injured party's previous actual experience.  The trial court concluded that in this case the evidence of previous child support collection ventures conducted by Maximus in other jurisdictions and

24

evidence of such collections by the DSS in Virginia had sufficient specificity to allow "a reasonable estimate of Maximus' lost profits."  Using this evidence, the jury was not required to speculate on Maximus' lost profits.  Accordingly, we will affirm the trial court's ruling allowing evidence of Maximus' lost profits.

## 2.  Qualification of Expert Witness

Lockheed next argues that even if the new business rule did not render Maximus' lost profits evidence inadmissible, the evidence should not have been admitted because it required expert testimony and Maximus' expert was not qualified to render such expert testimony.

Arthur Nerret, Maximus' expert, was a certified public accountant, had worked for a large, international accounting firm for five years, was a director of finance and vice-president in private industry for 18 years, and had served as Maximus' chief financial officer for four years.  His responsibilities included such tasks as financial reporting, budgeting, forecasting, cost proposal review, and banking and insurance matters.  He testified that he had reviewed the bid proposal, and validated the direct costs associated with the project.  In response to Lockheed's questions, Nerret explained the method he used to determine the revenue he estimated Maximus would receive from its contract with DSS.

25

Lockheed objected to the admission of Nerret as an expert to give an opinion on Maximus' potential profit from its contract with DSS because Nerret had not taken any special courses on lost profit or damage analysis and did not have personal involvement in preparing the revenue or cost information, but instead relied on the calculations of others. The trial court held that Lockheed's objection went to the weight of Nerret's testimony, not to his qualification as an expert witness, and allowed Nerret to give his opinion testimony.

Whether a witness is qualified to testify as an expert is a matter within the sound discretion of the trial court and the trial court's decision will not be set aside on appeal unless the record clearly shows that the witness is unqualified. Tazewell Oil Co., Inc. v. United Virginia Bank, 243 Va. 94, 110, 413 S.E.2d 611, 620 (1992). We cannot say that this record clearly shows that Nerret was not qualified and, therefore, we will affirm the trial court's ruling allowing Nerret to testify as an expert witness on the issue of lost profits.

### 3. Mitigation of Damages

Lockheed sought to introduce evidence of events occurring subsequent to cancellation of the initial Notice of Intent to Award the contract to Maximus. Specifically, Lockheed wanted

placed before the jury the following evidence:  the second request for proposals and award to Lockheed; Maximus' protest of the second award; reversal of that award by the appeals procurement board; a third request for proposals issued by DSS; the award of the contract to Lockheed pursuant to the third request; and Maximus' failure to file a protest to that award.  Lockheed asserts that this evidence was relevant because, even though Maximus prevailed in having the second award set aside, by failing to pursue a protest and appeal of the third award, Maximus made "no attempt in the third procurement to undo the award to Lockheed in order that it might recapture what was lost in its contract expectancy."

The trial court was correct in its holding that this evidence was not admissible to show that Maximus failed to mitigate its damages.  First, whether Maximus would not only have prevailed in its protest of the third award but also ultimately would have become the recipient of the contract award is entirely speculative.  Furthermore, § 11-66 authorizes the filing of a protest based upon matters relating to alleged deficiencies in the contract award, not for purposes of mitigating damages.

### D.  ADMISSIONS

Lockheed asserts that the trial court erred because it allowed Maximus to introduce testimony that contradicted its responses to Lockheed's requests for admission.

Prior to the first trial in 1996, Lockheed served Maximus with a number of requests for admissions. Two of those requests, Nos. 41 and 42, which Maximus admitted provide respectively:

> Evaluation committee member Ernest Lee Williams, within seven months prior to the day the Notice of Intent to award was posted, was an active candidate for employment as district manager of the Lockheed IMS project in Chesapeake, Virginia. Mr. Williams was not selected for the position.

> All evaluation members including Mr. Williams stated verbally that they were unaware of any situation and/or relationship with either of the two offerors that could be perceived as a reason for conflict of interest.

At the first trial, Williams testified that he was not an active candidate for employment with Lockheed. Even though his testimony conflicted with these admissions, Lockheed did not object to the testimony, and therefore any reliance on the admissions was waived. TransiLift Equipment, Ltd. v. Cunningham, 234 Va. 84, 91, 360 S.E.2d 183, 187 (1987). Following remand of the case, no further discovery was undertaken.

At the second trial, when Maximus again asked Williams if he had been an active candidate for employment with Lockheed

28

within seven months of the Intent to Award, Lockheed objected based on Maximus' earlier admission. Maximus moved to withdraw the admissions pursuant to Rule 4:11(b).[8] Lockheed objected to the motion, arguing that it had already quoted the admission in opening argument and, therefore, it would be prejudiced if Maximus were allowed to withdraw the admission at that point.

After discussion with counsel out of the presence of the jury, the trial court sustained Lockheed's objection to Maximus' withdrawal of the admission, stating that whatever decision it made one of the parties would be prejudiced. Maximus then proceeded to ask Williams a number of questions such as whether he had ever submitted an application to Lockheed, whether he considered a lunch with a representative of Lockheed to be a job interview, if he was denied employment with Lockheed, if he harbored any latent resentment against Lockheed, and whether he had told anyone he had been to lunch with a Lockheed representative. The record shows that when

---

[8] Rule 4:11(b) states in part:

Any matter admitted under this Rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission . . . the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that

Lockheed objected to a question, the trial court considered whether the question and answer contradicted the admissions, and overruled objections when it determined the question was proper. The trial court also allowed Lockheed to read admissions No. 41 and No. 42 to the jury. The trial court explained to the jury that the rules of court allow one party to ask another to admit that certain things are true, thereby eliminating the need to bring in witnesses to prove those things.

Decisions on whether testimony contradicts admissions are committed to the sound discretion of the trial court and will only be set aside on appeal if those decisions are shown to be an abuse of discretion. Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986). Based on our review of the record in this case, we cannot say that the trial court's determinations on whether the questions and testimony at issue contradicted the admissions made by Maximus were an abuse of discretion. Furthermore, if the denial of Lockheed's jury instruction that Maximus was bound by its admissions was error, such error was harmless in light of the trial court's instruction to the jury at the time the admissions were read.

### E.  MOTION TO STRIKE

---

withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.

Following the close of all the evidence, Lockheed moved to strike Maximus' evidence. The trial court took the matter under advisement and, after further briefing, denied the motion. Lockheed assigns error to this ruling in two particulars: (1) the trial court erred in failing to strike the evidence because the evidence did not establish improper methods and improper conduct; and (2) the trial court erred in failing to strike the evidence because the evidence did not establish that Lockheed's protest was the proximate cause of the cancellation of the Notice of Intent to Award the contract to Maximus. We consider these arguments in order.

## 1. Improper Conduct

Lockheed's first argument, that Maximus' evidence should have been struck because it did not show intimidation, fraud, defamation, misrepresentation, deceit, unethical conduct, sharp dealing, overreaching, or unfair competition, can, in the words of the trial court, be disposed of quickly. Suffice it to say that, considering the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff Maximus, as we must, Austin v. Shoney's, Inc., 254 Va. 134, 138, 486 S.E.2d 285, 287 (1997), Maximus' evidence was sufficient to present a prima facie case that Lockheed's actions were improper for purposes of Maximus' business tort claim.

Lockheed also argues that even if Maximus established a prima facie case, the evidence was not "sufficient to overcome Lockheed's affirmative defense." As pointed out by Maximus, Lockheed seems to be arguing that because it presented evidence to support its affirmative defense, it was entitled to prevail, absent additional evidence by Maximus. However, whether Lockheed produced sufficient evidence to prevail on its defense was a matter for the jury to decide. As the trial court stated, "the presentation of defendants' evidence does nothing more than create a jury issue." Accordingly, there was no error in the trial court's denial of the motion to strike on this basis.

## 2. Proximate Cause

Lockheed argues that the evidence failed to show that its protest was the proximate cause of DSS' decision to cancel the notice of the Intent to Award the contract to Maximus. The evidence, according to Lockheed, was that the cancellation resulted from DSS' own investigation and not as a result of the protest.

While there is evidence in the record to support Lockheed's assertion, there is also evidence that the Notice of Intent was cancelled because of the contents of Lockheed's protest, as well as Lockheed's actions surrounding the filing of the protest. The testimony of Henry and Crane, the call

from Wiggins telling Henry that if the Intent to Award went forward, things "could get bloody," and Crane's memorandum suggesting that the procurement would proceed assuming there were no more damaging facts in Lockheed's protest, represent some of the evidence suggesting that the protest and its contents were the reasons the Notice of Intent to Award the contract to Maximus was rescinded.[9]  The evidence was not without conflict and it presented a jury question on the issue of proximate cause.

Accordingly, the trial court correctly refused to strike Maximus' evidence for failure to establish proximate cause.

II.

<u>Maximus, Inc. v. Lockheed Information Management</u>
<u>Systems Company, Inc., et al.</u>
Record No. 990499

At trial the jury returned a verdict in favor of Maximus of approximately $1.5 million dollars on the tortious interference claim.  Following post-trial motions, the trial court reduced this amount to $741,124, holding that Maximus was not entitled to recover damages for costs incurred in preparing its initial bid or certain overhead expenses.

---

[9] Although Lockheed argues that the proximate cause instruction was confusing, it did not object to the instruction in the trial court and we do not consider that argument here.  Rule 5:25.

Maximus appeals the trial court's determination that it was not entitled to recover the overhead expenses.

The overhead expenses at issue were described by Nerret, Maximus' expert, as a "fixed sort of markup on top of those direct-expenses to absorb company-wide overhead expenses." Since Maximus did not obtain the contract, Nerret testified that "those costs had to be absorbed by our other contracts in the company over this five-year period. And thus . . . profitability of those other contracts was reduced by the [amount] those contracts will be absorbing." Essentially, the overhead was a fixed cost not attributable to the contract at issue.

We have recently addressed recovery of fixed overhead in Fairfax County Redevelopment & Housing Authority v. Worchester Brothers Co., Inc., 257 Va. 382, 514 S.E.2d 147 (1999). We held that home office expenses, normally referred to as overhead, are costs that the business must expend for the benefit of its enterprise as a whole. Unabsorbed overhead is that overhead which continues regardless of the business activity. Thus, a contractor experiences unabsorbed overhead when idle. When a breach by a party causes a delay to the ability of the other party to perform, the injured party is entitled to recover, as damages, unabsorbed overhead expenses. To recover such damages, the injured party must show that it

34

could not otherwise recoup its pro rata home office expenses incurred during the delay and it must prove the amount of these expenses with reasonable certainty.  Id. at 387-88, 514 S.E.2d 150-51.

In this case, the unabsorbed overhead sought by Maximus was not sought as part of its actual damages but as part of its lost profit.  We need not address this distinction here because, whether lost overhead is sought as damages or as a component of lost profit, the plaintiff is required to show that it was reasonably unable to recoup its overhead costs. Id.  There is no such evidence in this case.  Nerret characterized Maximus' overhead costs as "unabsorbed" or "unavoided" because they did not arise from the contract at issue, and therefore, continued whether or not Maximus was awarded the contract.  Neither Nerret nor any other witness addressed Maximus' ability or inability to reasonably recoup those expenses from another contract which could have been secured in the place of the contract with DSS.

Accordingly, although the trial court did not have the benefit of our decision in Fairfax County, we conclude that it did not err in holding that Maximus was not entitled to recover its overhead.

### III.

### Conclusion

35

In summary, for the reasons stated above, we will affirm that part of the trial court's judgment imposing liability on Lockheed for intentional interference with a business expectancy and setting damages in the amount of $741,124.  We will reverse that part of the trial court's judgment imposing liability on Lockheed and the Center for conspiracy in violation of § 18.2-499, and imposing treble damages, attorneys' fees and costs pursuant to § 18.2-500, and enter final judgment.

Record No. 990500  —  Affirmed in part, reversed in part, and final judgment.

Record No. 990499  —  Affirmed.