Present: Kinser, C.J., Lemons, Millette, Mims, McClanahan, and Powell, JJ., and Lacy, S.J.

ONLINE RESOURCES CORP.

v. Record No. 120208    OPINION BY JUSTICE DONALD W. LEMONS
                                        January 10, 2013
MATTHEW P. LAWLOR

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael F. Devine, Judge

In this appeal, we consider whether the Circuit Court of Fairfax County ("trial court") erred in a complex civil matter arising from termination of a corporation's chief executive officer from employment when it (1) refused to hold, as a matter of law, that no change in control occurred that would entitle Matthew P. Lawlor ("Lawlor") to mandatory severance benefits from Online Resources Corporation ("ORC"); (2) instructed the jury to construe any ambiguities in the contracts against the drafter; (3) submitted Lawlor's alternative theory of mandatory severance benefits to the jury; and (4) submitted Lawlor's claim for unjust enrichment to the jury.

We also consider whether the trial court abused its discretion when it (1) admitted the testimony of James Reda, Lawlor's damages expert; (2) permitted Lawlor to amend his complaint to plead the basis for recovering attorneys' fees; and (3) awarded Lawlor attorneys' fees and expenses.

1

I. Facts and Proceedings

In Lawlor's second amended complaint against ORC, he sought damages for breach of contract, unjust enrichment, and wrongful termination, as well as declarative and injunctive relief[1] in connection with ORC's termination of Lawlor's employment as Chief Executive Officer ("CEO"), his position as Chair of the Board of Directors, and his employment with ORC. Lawlor contended that he resigned under duress after reporting insider trading by Tennenbaum Capital Partners ("TCP"), ORC's largest voting shareholder. He also claimed that he was denied payments under the 2005 Stock Plan, as amended ("2005 Plan"), 1999 Stock Option Plan ("1999 Plan"), and 2009 Change in Control Severance Agreement ("Severance Agreement") that provided certain payments in the event of a "change in control" in the company. Additionally, Lawlor claimed that he was entitled to compensation to offset a pay reduction he took in 2009 with the understanding that he would be made whole in the future. Additionally, he demanded attorneys' fees and expenses.[2]

On March 24, 2011, Lawlor moved the court to defer the issue of attorneys' fees and expenses until after the trial.

---

[1] Lawlor's claims for declarative and injunctive relief were dismissed and are not before us on appeal.

[2] Although the parties use the term "costs," the Severance Agreement upon which the claim is based provides for "expenses." Therefore, we will use the term "expenses" throughout this opinion.

The trial court granted the unopposed motion, and both parties endorsed the order as "agreed."

An eleven-day jury trial took place in April 2011. The jury found for Lawlor on all counts except Count VI for wrongful termination, and awarded Lawlor $2,325,000 on Count I for breach of the 2005 Plan, $494,266 on Count II for breach of the 1999 Plan, $4,935,619 on Count III for breach of the Severance Agreement, and $360,000 on Count V for unjust enrichment, for a total of $5,295,619 in compensatory damages.[3] In the bifurcated proceeding, the trial court awarded attorneys' fees of $2,131,034.75 to Lawlor.

## Change In Control

Lawlor founded ORC in 1989 to provide on-line banking services. ORC went public in 1999, and Lawlor continued to serve as its CEO and the Chairman of its Board of Directors. In 2006, TCP invested $75 million in ORC and became a Class A-1 preferred shareholder with the right to designate a director to the Board. In 2007, Michael Leitner ("Leitner") became TCP's designee to the Board of Directors. Evidence presented revealed that Leitner and Lawlor had a contentious relationship.

ORC's stock price dropped significantly in 2008 and 2009. In 2009, TCP announced that it was running three of its own

---

[3] The damages in Count III overlapped with the damages in Counts I and II.

nominees for the Board of Directors. A proxy contest ensued, and the TCP nominees were elected in May 2009. In May 2009, the Board also approved the Severance Agreement. Lawlor signed the Severance Agreement on May 13, 2009.

Shortly after the proxy contest, Leitner wrote in an email to the other TCP nominees, who were now directors, that Lawlor "doesn't fully appreciate the significant governance change that has taken place, and that he is no longer in control. It just doesn't seep in for him." He added that Lawlor was resistant to "any process that requires him to seek our direction on issues" and "just doesnt [sic] get he is one election away from losing his job."

On December 9, 2009, the Board of Directors met in closed session without Lawlor and agreed that it was time for him to step down as CEO. On December 14, 2009, the Board voted to remove Lawlor immediately as CEO, but agreed to retain him as Chairman of the Board and as an employee until February 19, 2010.

On January 20, 2010, Lawlor resigned from the Board. That same day, one of the incumbent directors,[4] Joe Spalluto, also

---

[4] The "Incumbent Board" is defined in the Severance Agreement as the individuals who constituted the Board as of May 13, 2009, the date the Severance Agreement was executed. An "incumbent director" is a person who was a director as of May

resigned from the Board. The Board, which had ten seats, was then composed of four incumbent directors, the three new TCP directors, Leitner (the TCP designee), and two empty seats.

ORC offered Lawlor a severance package that Lawlor rejected because "it would have taken away any rights to claim for a change in control." Lawlor maintained that a change in control had occurred, and that he was entitled to mandatory severance benefits under the 1999 Plan, the 2005 Plan, and the Severance Agreement. All three of these plans defined "change in control," but with slight variations. The 2005 Plan defined "change in control" in relevant part as:

> (i) When any "person" as defined in Section 3(a)(9) of the Exchange Act and as used in Sections 13(d) and 14(d) thereof (including a "group" as defined in Section 13(d) of the Exchange Act, but excluding the Company, any Subsidiary or any employee benefit plan sponsored or maintained by the Company or any Subsidiary (including any trustee of such plan acting as trustee)), directly or indirectly, becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act, as amended from time to time), of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding securities.

> (ii) The individuals who, as of January 1, 2005, constitute the Board (the "Incumbent Board"), cease for any reason to constitute at least a majority of the Board; provided however, that any individual becoming a director subsequent to such date, whose election, or nomination for election

13, 2009, or who was elected after May 13, 2009 by at least three-quarters of the directors comprising the Incumbent Board.

by the Company's stockholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall, for purposes of this section, be counted as a member of the Incumbent Board in determining whether the Incumbent Board constitutes a majority of the Board.

The 1999 Plan defined "change in control" as:

(e) "Change in Control" means a change in control of the Company of a nature that; (i) would be required to be reported in response to Item 1 of the current report on Form 8-K, as in effect on the date hereof, pursuant to Section 13 or 15(d) of the Exchange Act; or (ii) without limitation such a Change in Control shall be deemed to have occurred at such time as (A) any "person" (as the term is used in Sections 13(d) and 14(d) of the Exchange Act) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 25% or more of the Company's outstanding securities except for any securities of the Company purchased by any tax qualified employee benefit plan of the Company; or (B) individuals who constitute the Board of Directors of the Company on the date hereof (the "Incumbent Board") cease for any reason to constitute at least a majority thereof, provided that any person becoming a director subsequent to the date hereof whose election was approved by a vote of at least three-quarters of the directors comprising the Incumbent Board, or whose nomination for election by the Company's stockholders was approved by a Nominating Committee serving under an Incumbent Board, shall be, for purposes of this clause (B), considered as though he were a member of the Incumbent Board; or (C) a plan of reorganization, merger, consolidation, sale of all or substantially all of the assets of the Company or similar transaction occurs in which the Company is not the resulting entity.

The Severance Agreement defined "change in control" as:

(e) A "Change in Control" shall mean any change in control of the Company of a nature that would be required to be reported in response to Item 1(a) of the Current Report on Form 10-K,[5] as in effect on the Effective Date, pursuant to Section 13 or 15(d) of the Act; provided that, without limitation, such a "Change in Control" shall be deemed to have occurred if:

(i) a third person, including a "group" as such term is used in Section 13(d)(3) of the Act, becomes the beneficial owner, directly or indirectly, of 50% or more of the combined voting power of the Company's outstanding voting securities ordinarily having the right to vote for the election of directors of the Company, unless such acquisition of beneficial ownership is approved by a majority of the Incumbent Board (as such term is defined in clause (ii) below); or

(ii) individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least three-quarters of the directors comprising the Incumbent Board (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the Directors of the Company, as such terms are used in Rule 14a-11 of the Regulation 14A promulgated under the Act) shall be, for purposes of this provision, considered as though such person were a member of the Incumbent Board.

ORC moved for summary judgment prior to trial, arguing that, as a matter of law, the Incumbent Board never ceased to be a majority and there was no change in control. The trial court

---

[5] This document reads "10-K," but the parties agreed below that this was a typographical error and should have been "8-K."

denied the motion, holding that the contract provisions were ambiguous.

At trial, ORC moved to strike Lawlor's evidence of a change in control, arguing that Lawlor failed to present sufficient evidence to demonstrate that a change in control occurred. The trial court denied the motion, holding that in the light most favorable to Lawlor there was sufficient evidence that a change in control had occurred to submit the matter to the jury. The trial court noted there was evidence that the composition of the Board changed and that TCP wrested control of ORC from the people who were originally running the company. ORC renewed its motion to strike at the close of evidence, and the trial court denied it.

Alternate Theory of Severance Benefits

At trial, Lawlor proposed an alternate theory to the jury for awarding severance benefits if the jury found there was no change in control. Lawlor argued that Paragraph 1 of the Severance Agreement made payment of severance benefits mandatory for a termination prior to a change in control. Paragraph 1 of the Severance Agreement stated:

> 1. Purpose and Scope of Company Obligations. The purpose of this Agreement is to document the severance benefits payable to the Participant in the event the Participant's employment with the Company (as defined below) is terminated as described herein. For terminations prior to the Protected Period, the severance benefits that **are**

**payable** to the Participant are as set forth in
the Company's Severance Pay Policy in effect on
the date of execution of this Agreement.

(Emphasis added.)  An email from the CFO, Cathy Graham, was
admitted to show she recommended changing the words "may be
payable" to "are payable" because the benefits were intended to
be "contractually guaranteed" and not discretionary.

Expert Testimony on Damages

ORC moved to exclude the testimony of Lawlor's damages
expert, James Reda.  ORC argued that Reda admitted he was not an
expert in stock valuation and that he did not conduct his own
independent evaluation of ORC's stock value; consequently, ORC
argued his testimony as to the value of ORC stock should be
excluded.  The trial court denied the motion.

Reda qualified as an executive compensation consultant,
with an expertise in advising companies on how much to pay
executives, including salary, bonus, long-term incentives,
severance requirements, and extra benefits.  He testified that
he was asked to calculate the severance amounts Lawlor was
entitled to receive in the event of a change in control of ORC,
as well as the severance amounts to which Lawlor would be
entitled if a determination were made that there had not been a
change in control.

Reda explained that as part of determining the value of
Lawlor's damages, he considered the value of Lawlor's stock

options.  Reda used two different stock prices when performing his calculations.  For the first set of calculations, Reda used the stock price of $7.01 per share, which was the highest price actually achieved between the date of Lawlor's termination and the date of trial.  Reda testified that under a change in control scenario, using the stock price of $7.01 per share, Lawlor was entitled to a severance payment of $4,935,619.  Reda testified that if no change in control occurred, using the stock price of $7.01 per share, Lawlor was entitled to a severance payment of $3,269,893.

Reda testified that Lawlor's damages could be even higher if the value of ORC stock were to increase.  For the second set of calculations, Reda used the stock price of $10.53 per share, which was a number he obtained from a Raymond James Investment Report that projected what the ORC stock price might be over a period including 2010 and 2011.  Using that stock price, Reda determined that Lawlor's damages under a change in control scenario would be $6,686,992.

Unjust Enrichment

At trial, Lawlor testified that he voluntarily accepted a 5% pay reduction in 2009; however, he had a clear understanding with the compensation committee and the Board that he was underpaid relative to the performance of the company, and he took the pay cut "with the understanding that it was going to

10

pay off down the road with the company coming back, rectifying that kind of a thing." He admitted that there was no written agreement, but he had "the understanding from the Board that they were going to correct my compensation, and I ha[d] every right to expect that at least the 30 percent that I took option on, that they would make me whole." Lawlor testified that Erv Shames ("Shames"), the chairman of the compensation committee, told Lawlor his compensation would be corrected.

Shames testified that the pay reductions in 2009 were Lawlor's idea in order to improve the company's earnings and cash position. Shames testified that Lawlor was not promised anything in exchange for his agreement to accept the pay reduction.

The court instructed the jury to find for Lawlor on Count V, the claim for unjust enrichment, if the jury found that Lawlor

> [H]as proved by the greater weight of the
> evidence that (1) the Plaintiff conferred a
> benefit on the Defendant; and (2) the Defendant
> knew that the Plaintiff was conferring the
> benefit; and (3) the Defendant accepted or
> retained the benefit under circumstances which
> would make it inequitable for the Defendant to
> retain the benefit without paying for its value.

### Jury Instruction N

Jury Instruction N was given at trial, which read: "In interpreting a contract, you should resolve any doubts about the

11

meaning of a word or phrase against the party who [drafted/prepared] the contract."  ORC objected to that instruction being given on the grounds that Lawlor participated in the drafting of the agreements at issue in this case.  Lawlor argued that ORC's general counsel was the drafter.  The trial judge determined that the jury should decide who the drafter was and who should get the benefit of any ambiguities.

## Attorneys' Fees

On May 23, 2011, Lawlor moved for over $2 million in attorneys' fees.  Lawlor argued that under the plain language of the Severance Agreement he was entitled to all reasonable fees incurred in the entire action, not merely the claim for breach of the Severance Agreement.  Paragraph 13 of the Severance Agreement states as follows:

> If a Participant commences a legal action to enforce any of the obligations of the Company under this Agreement and it is ultimately determined that the Participant is entitled to any payments or benefits under this Agreement, the Company shall pay the Participant the amount necessary to reimburse the participant in full for all reasonable expenses (including reasonable attorneys' fees and legal expenses) incurred by the Participant with respect to such action.

ORC argued that Lawlor's claim for attorneys' fees was waived pursuant to Rule 3:25, because Lawlor failed to specifically state the basis for the request in his complaint.

12

The court denied Lawlor's motion for attorneys' fees, finding the basis for the demand was not sufficiently pled pursuant to Rule 3:25.  Lawlor filed a motion for reconsideration, which the court denied.

On July 8, 2011, Lawlor filed a motion for leave to amend his complaint pursuant to Rule 1:8 in order to set forth with more specificity the basis for his demand for attorneys' fees. ORC claimed prejudice, arguing that it did not know Lawlor was going to request attorneys' fees for all of his claims.  ORC argued that if Lawlor was entitled to attorneys' fees, it was only for Count III because that was the only count related to the Severance Agreement.  A hearing on Lawlor's motion was held, after which the trial court granted the motion to amend, finding the posture of the case was still "pre-trial" as it concerned attorneys' fees, so the amendment was appropriate in accordance with Rule 1:8.  The trial court also held that under Delaware law, Lawlor was entitled to all of his attorneys' fees and expenses, not just the ones directly attributable to Lawlor's enforcement of the Severance Agreement.  The trial court then granted Lawlor's previously filed motion for award of fees and expenses and awarded him $2,131,034.75.

ORC filed its notice of appeal, and we granted an appeal on the following assignments of error:

13

1. The trial court erred by refusing to hold, as a matter of law, that the Company underwent no "change in control" that would entitle Lawlor to the mandatory severance benefits that he claimed.

2. The trial court erred by instructing the jury to construe any ambiguity in the contracts against the drafter; that rule of last resort was unnecessary to interpret the contract language and did not apply because Lawlor, the CEO and Chairman of the Board, directed and oversaw the drafting of the very documents he sought to enforce against the Company.

3. The trial court erred by failing to reject Lawlor's alternative theory that he was entitled to mandatory severance benefits, even absent a change in control, because the plain language of the Severance Agreement did not alter the discretionary terms of the Company's severance policy.

4. The trial court erred by failing to exclude the testimony of Lawlor's damages expert when he admitted he was unqualified to determine the value of the Company's stock, yet proceeded to choose speculative, high-end stock valuations to compute Lawlor's damages.

5. The trial court erred in ruling the evidence sufficient to support Lawlor's unjust enrichment claim because there was no evidence ORC should reasonably have understood it was obligated to compensate Lawlor for the company-wide pay cut Lawlor instituted when he was Chairman and CEO.

6. Because Lawlor should not have recovered for breach of the Severance Agreement in Count III – the only Count involving a fee-shifting provision – the trial court erred by awarding him attorney's fees and expenses.

7. The trial court erred in holding that the Severance Agreement at issue in Count III entitled Lawlor to recover his legal fees for the entire case, including unsuccessful and unrelated counts.

8. The trial court erred in permitting Lawlor to amend his complaint, post-verdict, to plead the basis for recovering attorneys' fees under Rule 3:25.

14

## II. Analysis

### A.  Change in Control

#### i.  Standard of Review

"Whether the language of a contract is ambiguous is a question of law that we review de novo."  Preferred Sys. Solutions, Inc. v. GP Consulting, LLC, 284 Va. 382, 391, 732 S.E.2d 676, 680 (2012).  We have said that "[c]ontract language is ambiguous when 'it may be understood in more than one way or when it refers to two or more things at the same time.'"  Id. (quoting Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 632, 561 S.E.2d 663, 668 (2002)).  Ordinarily, it is the duty of the court to construe a written contract when it is clear and unambiguous on its face, but when a contract is ambiguous it is necessary to resort to parol evidence to ascertain the intention of the parties.  In such cases, if reasonable people could draw different conclusions, the meaning of the contract upon the evidence presented should be submitted to the jury.  See Greater Richmond Civic Recreation, Inc. v. A.H. Ewing's Sons, Inc., 200 Va. 593, 596, 106 S.E.2d 595, 597 (1959).

#### ii. Choice of Law

The 1999 and 2005 Plans as well as the Severance Agreement contain provisions requiring that these instruments be interpreted under Delaware law.  However, at trial the parties

15

offered a potpourri of citations from Virginia and Delaware and elsewhere making it difficult to ascertain what law the parties thought controlled a particular issue.  Additionally, on appeal ORC cites Delaware law on matters which at trial it did not advance.  Throughout this opinion such discrepancies will be noted.

### iii. Analysis

Lawlor advances two primary grounds for his assertion that there was a change in control sufficient to support the jury's award:

(1)  The 1999 Plan and the Severance Agreement include a change of a nature that would be required to be reported in response to section 1 of SEC Form 8-K,[6] and

(2)  The 1999 and 2005 Plans and the Severance Agreement each provided that a change in control would occur when the "Incumbent Board" members ceased to have a majority.

ORC maintains that, as a matter of law, there was no change in control and the question never should have been submitted to the jury.  Much of ORC's argument involves interpretation of Delaware corporate law.  However, this case is fundamentally a contract dispute.  Predominantly, in this case, whether there

---

[6] It is unnecessary to address this basis for change of control because we resolve this question upon the second basis advanced.

was a change in control is a factual determination. Additionally, to the extent that the contractual provisions are ambiguous, it is proper to submit the question to the jury for consideration.  See Greater Richmond Civic Recreation, 200 Va. at 596, 106 S.E.2d at 597.

A threshold question is presented: For determination of the number of directors required, does the term "Board" in these contract provisions unambiguously mean only the directors then sitting, or does it mean the total number of seats irrespective of whether the seat is filled?  Lawlor's argument on this question is two-fold:

(1)  the plain meaning of the contractual provisions provide that "Board" refers to the total number of directorships, and

(2)  at best, the provisions are ambiguous and the jury was permitted to resolve the matter.

Considering the Severance Agreement, Lawlor notes that the term "Incumbent Board" refers to individuals who are defined and that a change in control occurs when the Incumbent Board ceases for any reason to be a majority of the Board.  He further argues that after he and Spalluto resigned, at most only five Incumbent Board members remained on the ten seat Board of Directors. Arguing that six seats are required for a majority under the

17

contract provisions, Lawlor asserts that a change of control took place.

Additionally, Lawlor points to the testimony of Michael Bisignano, ORC's General Counsel and the principal drafter of the language in question. He testified that unlike the term "Incumbent Board," the term "Board" did not refer to individuals, although he could have drafted the agreement in such a manner to so provide. Also, Lawlor introduced into evidence the ORC Board of Directors Manual ("Manual") and argued that the Manual repeatedly used the term "Board of Directors" to refer to all seats.

ORC seeks to incorporate Delaware corporate law into the Severance Agreement by asserting that "majority of the Board" has a "default" meaning that excludes vacant seats. The record does not show that anyone intended such a meaning and the testimony of ORC's general counsel is contrary to such an interpretation of the contractual provisions.

The resolution of the change in control question in this contractual dispute based upon Board membership is not a matter of Delaware corporate law. Rather, it is a matter of contract interpretation.[7] The trial court determined that the term

_____

[7] ORC states in its brief that the Delaware standards of contract interpretation are the same as Virginia standards, which may account for the citation of no Delaware cases on the subject.

18

"Board" was ambiguous, and that he could not decide "as a matter of law that incumbent Board members did or did not cease to constitute a majority of the Board." Counsel for ORC conceded in his argument on the motion to strike that the "issue of is it seats or is it people," "I think reasonable people can disagree on that." On the evidence presented, we cannot say that the trial court erred in submitting the question to the jury, and we cannot say that the jury verdict was plainly wrong or without evidence to support it. See Code § 8.01-680.

### B.    Jury Instruction N

### i.    Standard of Review

When reviewing the substance of jury instructions given by a trial court, this Court's responsibility is to see that the law has been clearly stated and the instructions cover all issues which the evidence fairly raises. Bennett v. Sage Payment Solutions, Inc., 282 Va. 49, 55, 710 S.E.2d 736, 740 (2011). A litigant is entitled to jury instructions supporting their theory of the case if there is sufficient evidence to support that theory and if the instructions correctly state the law. Id. There must be more than a scintilla of evidence introduced in support of a requested instruction. Id. The determination whether a jury instruction accurately states the relevant law is a question of law that we review de novo.

<u>Orthopedic & Sports Physical Therapy Assocs. v. Summit Group</u>
<u>Props., LLC</u>, 283 Va. 777, 782, 724 S.E.2d 718, 721 (2012).

ii.  Analysis

Jury Instruction N directed the jury to construe any ambiguities in the contracts against the drafter.  On appeal, ORC argues that under Delaware law the doctrine of <u>contra proferentem</u> is a rule of last resort and thus an instruction on this doctrine should not have been given in this case.  ORC cites numerous Delaware cases in support of its position on appeal.  At trial, however, ORC never raised any arguments under Delaware law or referred the trial court to any Delaware case law that would prohibit this instruction from being given.  The trial judge informed the parties that he was going to use a Virginia Model Jury Instruction instead of the federal model instructions or Delaware instructions the parties originally submitted.  The parties did not object to this decision by the trial court and have not assigned error to it on appeal.

The only objection to the instruction offered by ORC was that Lawlor was not entitled to it because he participated in the drafting of the various contracts at issue.  That was the only argument made to the trial court against this instruction, and therefore that is the only argument we will consider on appeal. Rule 5:25.  Accordingly, we will not consider the argument ORC makes on appeal based upon Delaware law.

At trial, Bisignano testified that he was the principal drafter and that Lawlor merely gave him several copies of form contracts. The trial court judge found that both parties were involved in the drafting, and determined that he would grant Instruction N and leave it to the jury to decide who the drafter was as a matter of fact, and then apply the principle of contra proferentem.

While it appears from the record that Lawlor did present "more than a scintilla" of evidence to support the proposition that he was not the drafter of the terms in question, a jury verdict based on an erroneous instruction need not be set aside if it is clear that the jury was not misled. Riverside Hosp., Inc. v. Johnson, 272 Va. 518, 536-37, 636 S.E.2d 416, 426 (2006). Applying this principle, we conclude that even if Instruction N was improperly given, such error would not require the jury verdict to be set aside in this case. The instruction did not dictate to the jury who the drafter was; rather, it left the contested issue to their resolution.

C.  Alternative Theory of Severance Benefits

i.  Standard of Review

As noted at the outset of Part II above, whether the language of a contract is ambiguous is a question of law that is reviewed de novo. Preferred Sys. Solutions, 284 Va. at 391, 732 S.E.2d 676. We have also held that contract language is

21

ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. Id.

### ii. Analysis

The language of paragraph 1 of the Severance Agreement states that "[f]or terminations prior to the Protected Period, the severance benefits that are payable to the participant are as set forth in the Company's Severance Pay Policy in effect on the date of execution of this Agreement."[8] The phrase "are payable" has a mandatory connotation. The benefits referenced in the Severance Pay Policy ("Severance Policy") are discretionary, as the Severance Policy states, "[s]everance pay and benefits are available for eligible employees in the event of an involuntary separation, not cause-related, to provide salary and benefit continuation to ease the employee's transition. Severance eligibility is determined by Executive Management." The Severance Policy also stated that all of its components were "subject to change without prior notice and as appropriate to reflect the current business and financial conditions of the company."

ORC argues that the Severance Agreement does not supersede the Severance Policy, but merely references the Severance Policy as a secondary means of requesting severance if a change of

---

[8] The Severance Agreement and the Severance Pay Policy are two different documents.

22

control has not occurred.  Lawlor asserts that the language "the severance benefits that are payable" clearly renders severance under the Severance Pay Policy mandatory rather than discretionary.

It appears that both of these possible interpretations of the Severance Agreement are reasonable.  Because there is more than one reasonable way to understand this language, the language is ambiguous.  Accordingly, the circuit court did not err in holding that it was ambiguous and in permitting Lawlor to introduce extrinsic evidence to support his position.

D.   Expert Testimony

i.   Standard of Review

"Whether a witness is qualified to testify as an expert is a matter within the sound discretion of the trial court and the trial court's decision will not be set aside on appeal unless the record clearly shows that the witness is unqualified." Lockheed Info. Mgmt. Sys. Co. v. Maximus, Inc., 259 Va. 92, 111, 524 S.E.2d 420, 430 (2000).  The Court applies an "abuse of discretion standard when reviewing a trial court's decision to admit expert opinion testimony."  CNH America LLC v. Smith, 281 Va. 60, 66, 704 S.E.2d 372, 375 (2011).  Expert testimony is admissible not only when scientific knowledge is required, but when experience and observation in a special calling give the

23

expert knowledge of a subject beyond that of persons of common knowledge and ordinary experience.  Id.

### ii. Analysis

ORC argues that the trial court erred in permitting Reda to testify after he admitted that he was not an expert in stock valuation.  In CNH America, we held that the trial court abused its discretion in permitting the plaintiff's hydraulics expert to testify after admitting that he was not an expert in the specifics of disc mower hydraulics.  Id. at 69, 704 S.E.2d at 376.  In that case, the expert was only qualified to testify regarding hydraulic systems generally, but he nonetheless testified about the hydraulic system of the specific disc mower at issue.  Id. at 65, 704 S.E.2d at 374.

Reda was not offered as an expert in stock valuation; he was offered as an expert in executive compensation.  In reaching his determination of Lawlor's damages, Reda used two different stock prices in his calculations.  For the first calculation, he used the stock price of $7.01 per share, which was the actual price that ORC stock reached in February 2011.  For the second calculation, he used the stock price of $10.53 per share, a number obtained from a Raymond James Investment Report that was prepared for ORC.  We previously affirmed a trial court's determination that the use of calculations by others "went to the weight of [the expert]'s testimony, not to his qualification

as an expert witness." <u>Lockheed</u>, 259 Va. at 111, 524 S.E.2d at 430.

The jury awarded Lawlor the amount of damages that Reda calculated using the $7.01 per share stock price. Because this stock price was the actual publicly traded stock price, it was reasonable for Reda to use that number in his calculations, and an independent valuation of the stock was not required to make his testimony admissible. The fact that the stock price had dropped significantly since Reda performed his calculations using the $7.01 price per share was information that ORC could use on cross-examination and that the jury could consider when determining an award for damages; however, it did not affect the admissibility of Reda's testimony. As in <u>Lockheed</u>, we cannot say that this expert was unqualified to offer the subject testimony. <u>Id.</u>

Unlike the expert in <u>CNH America</u>, Reda did not take general knowledge and apply it to specific unknowns in this case. Instead, Reda took reliable stock valuations that he did not calculate and used those valuations to create the specific calculation that he was well-qualified to compute. Accordingly, the trial court did not abuse its discretion when it admitted Reda's expert opinion testimony.

### E. Unjust Enrichment

#### i. Standard of Review

A judgment should be reversed for insufficient evidence only if it is "plainly wrong or without evidence to support it." Atrium Unit Owners Ass'n v. King, 266 Va. 288, 293, 585 S.E.2d 545, 548 (2003) (internal quotation marks omitted).

### ii. Analysis

ORC argues that the trial court erred in ruling that the evidence was sufficient to support Lawlor's unjust enrichment claim, because there was no evidence that "ORC should reasonably have understood it was obligated to compensate Lawlor for the company-wide pay cut Lawlor instituted when he was Chairman and CEO." Lawlor contends the evidence was sufficient to prove that he worked for a substantially reduced salary and performed well, and that there was an understanding that he would be made whole in the future. Although ORC moved to strike the unjust enrichment count, thereby preserving its claim regarding the sufficiency of the evidence, ORC did not object to the specific wording of the jury instruction on this issue. It is well settled that instructions given without objection become the law of the case and thereby bind the parties in the trial court and this Court on review. Owens-Illinois, Inc. v. Thomas Baker Real Estate, Ltd., 237 Va. 649, 652, 379 S.E.2d 344, 346 (1989).

The instruction did not direct the jury to determine that ORC "should reasonably have understood it was obligated to compensate Lawlor." Instead, the instruction first required a

26

finding that Lawlor conferred a benefit on ORC, which he did when he took the voluntary pay reduction. Second, the instruction required a finding that ORC knew Lawlor was conferring a benefit. There is no dispute that ORC knew Lawlor was taking a voluntary pay reduction. Lastly, the instruction required a finding that ORC "accepted or retained the benefit under circumstances which would make it inequitable for [ORC] to retain the benefit without paying for its value." Lawlor presented evidence that he took this pay cut with the understanding that in the future, when the company was doing better financially, he would be made whole.

We cannot say that, viewed in the light most favorable to Lawlor, the jury's award on the unjust enrichment claim, based upon the instruction it was given, was plainly wrong or without evidence to support it.

### F.   Attorneys' Fees

#### i.   Standard of Review

The decision of the trial court to allow an amendment to the complaint for attorneys' fees is a determination within the sound discretion of the trial court. On appeal, we review the trial court's decision for abuse of discretion. See Peterson v. Castano, 260 Va. 299, 302-03, 534 S.E.2d 736, 738 (2000). Whether the Severance Agreement entitled Lawlor to recover his legal fees for all claims in the entire case is a question of

27

law, which this Court reviews de novo.  <u>Cappo Management V, Inc.
v. Britt</u>, 282 Va. 33, 37, 711 S.E.2d 209, 210-11 (2011).

### ii.  Post-Verdict Amendment

Rule 1:8 provides in pertinent part that "[n]o amendments shall be made to any pleading after it is filed save by leave of court" and that "[l]eave to amend shall be liberally granted in furtherance of the ends of justice."

Rule 3:25 provides in pertinent part that "[a] party seeking to recover attorney's fees shall include a demand therefor" and that "[t]he failure of a party to file a demand as required by this rule constitutes a waiver by the party of the claim for attorney's fees, unless leave to file an amended pleading seeking attorney's fees is granted under Rule 1:8."

Lawlor attached the Severance Agreement to his Second Amended Complaint.  Rule 1:4(i) provides: "The mention in a pleading of an accompanying exhibit shall, of itself and without more, make such exhibit a part of the pleading." In his complaint, Lawlor alleged a breach of the Severance Agreement in Count III, and in his prayer for relief, he requested attorneys' fees.

It is undisputed that both parties agreed to wait until after trial on the merits to litigate the issue of attorneys' fees.  ORC contends that the trial court abused its discretion by allowing Lawlor to amend his complaint to include a more

28

specific reference to the Severance Agreement, which was the basis for Lawlor's fee request. ORC argues that under this Court's holding in Powell v. Sears, Roebuck & Co., 231 Va. 464, 344 S.E.2d 916 (1986), post-verdict amendments are not permitted.

The trial court in this case determined that Powell's restriction on post-verdict amendments did not apply because the parties were "not post-verdict on attorney fees." While we disagree with the trial court's determination that the attorneys' fee issue was "not post-verdict," we hold that in the context of this case, it was not an abuse of discretion to permit recovery of attorneys' fees.

A review of ORC's brief illuminates the real issue. ORC states, "[f]or while Lawlor's counsel had disclosed before trial that he planned to seek fees under Count 3, he failed to disclose that he would seek fees for all of the other counts, even if he lost them." ORC's admission reveals that an amendment on this issue was unnecessary regarding claims for attorneys' fees under Count III, but may have been necessary to cover additional fees under an expanded theory under Delaware law characterized by Lawlor as an "all or nothing" recovery. Because we reject Lawlor's theory regarding expanded recovery of legal fees, he is left with recovery only under Count III, a

29

claim that ORC admits was properly identified at trial. See

Part II.F.iii., infra.

### iii. Amount of Fees

Paragraph 13 of the Severance Agreement states:

> If a Participant commences a legal action to
> enforce any of the obligations of the Company
> under this Agreement and it is ultimately
> determined that the Participant is entitled to
> any payments or benefits under this Agreement,
> the Company shall pay the Participant the amount
> necessary to reimburse the participant in full
> for all reasonable expenses (including reasonable
> attorneys' fees and legal expenses) incurred by
> the Participant with respect to such action.

(Emphasis added.)  A plain reading of this paragraph makes it

clear that a participant is only entitled to attorneys' fees and

legal expenses for legal actions brought to enforce obligations

of ORC "under this Agreement."

Curiously, ORC contends that our holding in Ulloa v. QSP,

Inc., 271 Va. 72, 624 S.E.2d 43 (2006), is controlling and bars

Lawlor's recovery of attorneys' fees for anything beyond Count

III, and that the trial court mistakenly ruled that Delaware law

entitled Lawlor to fees on all counts on an "all or nothing"

basis.  We note that the Severance Agreement is governed by

Delaware law, and our holding in Ulloa is therefore

inapplicable.  We must, therefore, examine Delaware law and the

cases relied upon by the trial court.

In reaching its determination that Lawlor was entitled to all of his attorneys' fees and expenses, the trial court relied upon West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC, 2009 Del. Ch. LEXIS 23 (Del. Ct. Ch. 2009), Comrie v. Enterasys Networks, Inc., 2004 Del. Ch. LEXIS 53 (Del. Ct. Ch. 2004), and Brandin v. Gottlieb, 2000 Del. Ch. LEXIS 97 (Del. Ct. Ch. 2000), to reach its conclusion that Delaware law espouses an "all or nothing" approach to attorneys' fees. However, all of those cases involved situations distinguishable from the facts in this case.

In all three of the cited cases, the issue before the court was whether the party seeking attorneys' fees was a "prevailing party" since they had not been successful on all the claims they brought. Additionally, in each of these cases, the court interpreted provisions of a particular agreement. The court in all three cases determined that under the "all or nothing" approach, the party who prevailed on any of their claims was the "prevailing party" and they were entitled to all their fees, even fees for the claims they lost. See West-Willow Bay Court, 2009 Del. Ch. LEXIS 23 at *31-34 & n.58 (holding that the plaintiff was entitled to all of its fees for the breach of contract action, even though the plaintiff was denied specific performance); Comrie, 2004 Del. Ch. LEXIS 53 at *7-11 (holding that the court's decision rested solely on a breach of contract

31

theory and the plaintiffs were the prevailing party even though they only received 28% of the remedy sought); Brandin, 2000 Del. Ch. LEXIS 97 at *86-92 and n.76 (holding that plaintiff was the prevailing party and entitled to all of her litigation expenses even though she was unsuccessful on some of her claims). All of the claims in these cases were related to breach of the same underlying agreement or contract. In the present case, by contrast, Lawlor's claims for unjust enrichment, wrongful termination, breach of 2005 Plan and breach of 1999 Plan were separate from the claim to enforce ORC's obligations under the Severance Agreement.

Because, as noted above, we affirm the jury's verdict for breach of the Severance Agreement in Count III, we hold that the trial court would be correct in awarding Lawlor attorneys' fees and expenses with respect to that count. However, the trial court erred in awarding Lawlor his attorneys' fees and expenses for the claims outside of Count III. We note that Lawlor did not prevail on his claim for wrongful termination, but the attorneys' fees calculation was apparently included this claim. We reverse the trial court's award of $2,131,034.75 in attorneys' fees and remand this matter to the trial court for a determination of the amount of attorneys' fees and expenses Lawlor incurred as a result of enforcing ORC's obligations under the Severance Agreement. We are mindful that such a

determination will require careful consideration of overlapping issues.

## III. Conclusion

We hold that the trial court did not err when it:

(1) refused to hold, as a matter of law, that no change in control occurred; held that the language regarding change in control was ambiguous; submitted the question to the jury; and held that the evidence was sufficient to support and affirm the jury's award;

(2) gave Jury Instruction N;

(3) submitted Lawlor's alternative theory of severance benefits to the jury; and

(4) held the evidence was sufficient to support Lawlor's unjust enrichment claim.

Additionally, we hold that the trial court did not abuse its discretion when it:

(1) permitted James Reda to testify as Lawlor's damages expert; and

(2) awarded attorneys' fees and expenses for breach of the Severance Agreement.

However, we hold that the trial court erred in determining the Severance Agreement entitled Lawlor to recover his legal fees for claims that were not related to breach of the Severance Agreement.

Accordingly, we will affirm the judgment of the trial court in part, reverse in part and remand for further proceedings consistent with this opinion.

Affirmed in part,
reversed in part,
and remanded.

JUSTICE McCLANAHAN, with whom JUSTICE MIMS joins, concurring in part and dissenting in part.

The majority's disposition of the change in control issue in this case ignores the language of the contracts and disregards fundamental principles of corporate governance.  In every contract at issue here, the parties agreed that the contract was to be controlled by Delaware law.  Virginia respects such choice of law clauses.  Paul Business Sys., Inc. v. Canon U.S.A., Inc., 240 Va. 337, 342, 397 S.E.2d 804, 807 (1990) ("[W]here parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of particular jurisdiction, we will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction.").  Delaware law thus applies to this case.

"One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation."  Quickturn Design Sys., Inc. v Shapiro, 721 A.2d 1281, 1291 (Del. 1998).

34

Thus, the Board of Directors controls the company, not the CEO. See Del. Code Ann. tit. 8, § 141(a) ("The business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors.").  In fact, the CEO only has powers such as may be granted by the board of directors.  See Del. Code Ann. tit. 8, § 142(a).  Simply put, for a change of control to occur, the body with the control must change; a change in the control, power, or influence of the CEO is irrelevant.

It is with these core concepts in mind that we must analyze whether there has been a "change in control" under the 2005 Plan, the 1999 Plan, and the Severance Agreement (the contracts).  And, the context of the contracts cannot be ignored.  "In Delaware, contract interpretation is a matter of law.  The intent of the parties is ascertained from the language of the contract in its context."  Fujisawa Pharm. Co., Ltd. v. Kapoor, 655 A.2d 307 (Del. 1995) (citations omitted).  The majority opines that the majority of the board could be reasonably interpreted as a majority of the total number of seats on the board, rather than the majority of the occupied seats.  However, in the context of control by the incumbent members and any change therefrom, empty seats cannot be considered; empty seats on the board are irrelevant to a controlling majority.  Unoccupied seats hold no power of control

35

and the number of unoccupied seats cannot diminish the majority voting power.  Regardless of the number of unoccupied seats, as long as the incumbent board retains a majority of the voting power, it retains the power of the board and control over the company.  All three contracts state that there is a change of control if the incumbent board "cease[s] for any reason to constitute at least a majority of the Board." To conclude that there was a change in control in this board, one must reject the reality that incumbent members of the board held a majority voting power of the board of directors – the body of control – throughout the events of this controversy.

The 1999 Plan and the Severance Agreement mandate that a change of control also occurs when there is a change in control "of a nature that . . . would be required to be reported . . . pursuant to . . . the [Securities] Exchange Act."  The SEC definition of control focuses on the power to direct the management and policies of a company – that is the board's function.[1]  Del. Code Ann. tit. 8, § 141(a).  Consistent therewith, under general corporate law principles, the power to direct a company lies in the board of directors, not any single

---

[1] SEC regulations define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2 (2011).  The term "person" includes a company under 15 U.S.C. § 78c(a)(9).

individual.  Del. Code Ann. tit. 8, § 142(a).  Although Lawlor
saw the company as his own, control rested with the board of
directors.  Id.  And, the mere waning of a single director's
power is not enough to constitute a change in control that then
must be reported to the SEC.  To hold otherwise would be a
breathtakingly radical application of the law of corporate
governance.

Additionally, Lawlor's alternative theory of severance
benefits should not have been submitted to the jury because the
language of the contract was not ambiguous.  As the majority
notes, the Severance Agreement stated that, in the event there
was no change in control, "severance benefits that are payable
to the participant are as set forth in the Company's Severance
Pay Policy in effect at the date of the execution of this
Agreement."  The referenced Severance Pay Policy states that
payments under this plan are under the discretion of executive
management.  The incorporation by reference of the Severance Pay
Policy in the Severance Agreement does not transform the nature
of the payments under the Severance Pay Policy from a
discretionary matter to a mandatory one, particularly in light

of sections 2 and 3 of the Severance Pay Policy granting executive management power over such payments.[2]

In sum, because I believe there was no change in control as a matter of law, I would hold the trial court erred in submitting Lawlor's claims for mandatory severance benefits to the jury and would reverse the trial court's judgment awarding damages on those claims.  Since I do not believe the issue of change of control should have been submitted to the jury for consideration, I would not reach the issues related to the admission of the expert testimony and award of attorneys' fees and expenses.  However, I agree that, based on the jury instruction submitted without objection, the evidence was sufficient to submit the claim for unjust enrichment and would affirm the trial court's judgment awarding damages on that claim.

---

[2] Section 2 states that "Severance pay and benefits are typically provided . . . as deemed appropriate by Executive Management."  Section 3 states that "Severance pay and benefits are available for eligible employees [as] determined by Executive Management."